**Robert VERYZER, Ph.D., Plaintiff,**

v.

**AMERICAN INTERNATIONAL LIFE ASSURANCE COMPANY OF NEW YORK, et al., Defendants.**

**No. 09 Civ. 8229(RMB).**

United States District Court, S.D. New York.

Feb. 4, 2011.

Alan Carl Milstein, Jeffrey P. Resnick, Leily Schoenhaus, Sherman Silverstein Kohl Rose & Podolsky, Pennsauken, MA, for Plaintiff.

Robert P. Lesko, Wilson Elser Moskowitz Edelman & Dicker LLP, Newark, NJ, for Defendants.

### *DECISION & ORDER*

RICHARD M. BERMAN, District Judge.

## I. Introduction

On September 28, 2009, Robert Veryzer, Ph.D. ("Plaintiff"), filed a complaint ("Complaint") against American International Life Assurance Company of New York ("AI Life" or "Defendant") pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), seeking a declaration that AI Life erroneously denied Plaintiff's February 2008 claim for long-term disability benefits ("Benefits Claim") under a group insurance policy ("Policy") issued by AI Life to Plaintiff's employer. (*See* Compl., dated Sept. 25, 2009, ¶¶ 2, 21, 26.) Plaintiff alleges that AI Life's denial of the Benefits Claim based upon its determination that Plaintiff's (acknowledged) disability fell within the Policy's "Mental Illness" provision—which limits benefits to 24 months—"was unsupported by substantial evidence, erroneous as a matter of law, not made in good faith, and in violation of ERISA." (Compl. ¶¶ 12, 19, 21, 31.)

On August 26, 2010, after the parties had attempted unsuccessfully to mediate the matter, AI Life moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."), arguing that Plaintiff's claim fails because AI Life's denial of Plaintiff's Benefits Claim "is supported by substantial evidence, including an [i]ndependent [m]edical [r]eview by an expert in medical and forensic neuropsychology [David E.

Hartman, Ph.D.], as well as a [p]eer [r]eview by a forensic toxicologist [Jerold B. Leikin, M.D.]." (AI Life's Mem. of Law in Supp. of Mot. for Summ. J., dated Aug. 26, 2010 ("AI Life Mem."), at 2; *see also* AI Life's Ltr. to the Ct., dated June 16, 2010.)

On September 23, 2010, Plaintiff opposed AI Life's motion and also cross-moved for summary judgment, arguing that "Defendant's application of the Policy's Mental Illness limitation to [Plaintiff's] claim is arbitrary and capricious [and] the determination is unreasonable and unsupported by substantial evidence." (Pl.'s Mem. of Law in Opp'n to AI Life's Mot. for Summ. J & in Supp. of Pl.'s Cross–Mot. for Summ. J., dated Sept. 23, 2010 ("Pl. Mem."), at 13.) Plaintiff contends that significant evidence in the record from Plaintiff's treating physicians contradicts the two (paid) experts—Hartman and Leikin—relied on by AI Life, "who did not examine or interview [P]laintiff." (Pl. Mem. at 2.)

On October 8, 2010, AI Life filed a reply and opposition to Plaintiff's cross-motion. (*See* AI Life's Reply Mem. of Law in Supp. of AI Life's Mot. for Summ. J & in Opp'n to Pl.'s Cross–Mot. for Summ. J., dated Oct. 8, 2010 ("AI Life Reply").) On October 22, 2010, Plaintiff filed a surreply. (*See* Pl.'s Surreply Mem. of Law in Opp'n to AI Life's Mot. for Summ. J. & in Supp. of Pl.'s Cross–Mot. for Summ. J., dated Oct. 22, 2010 ("Pl. Surreply").) On January 18, 2011, the Court heard oral argu-

ment. (*See* Tr. of Proceedings, dated Jan. 18, 2011 ("Hr'g Tr.").) [1]

**For the reasons set forth below, AI Life's motion for summary judgment is denied and Plaintiff's cross motion for summary judgment is granted.**

## II.  Background

AI Life issued the Policy, effective January 1, 2004, to Rensselaer Polytechnic Institute ("Rensselaer"), a university located in Troy, New York. (*See* AI Life's Local Rule 56.1 Statement of Material Facts, dated Aug. 26, 2010 ("AI Life 56.1"), ¶ 1; Pl.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, dated Sept. 23, 2010 ("Pl. 56. 1"), ¶ 1.) At that time, Plaintiff was a tenured Associate Professor at Rensselaer's Lally School of Management. (*See* Administrative Record, filed Aug. 26, 2010 ("Record"), at 4, 6; AI Life 56.1 ¶ 2; Pl. 56.1 ¶ 1.) Plaintiff is 50 years old. (*See* Record at 208.)

The Policy provides, in relevant part, that a claimant will be paid monthly benefits if the claimant becomes and remains "[d]isabled while insured under the Policy," has been "under the Regular Care of a Physician," and "submit[s] proof of loss satisfactory to" AI Life, the Policy's claim administrator. (Record at 4, 6, 12; AI Life 56.1 ¶ 3; Pl. 56.1 ¶ 7.) "Disabled" means "prevented by ... accidental bodily injury[,] sickness[, or] Mental Illness" "from performing some, but not all, of the essential duties of [the claimant's] or any occupation." (Record at 8; Pl. 56.1 ¶ 5.)

---

1.  By letter dated July 15, 2010, and again at oral argument, the parties waived their right to a trial of this matter and agreed that the Court's determination of their cross motions would be dispositive. (*See* Pl.'s Ltr., dated July 15, 2010; Order, dated July 21, 2010; Hr'g Tr. at 2:20–3:5 (COURT: "[T]he parties are waiving their trial in this matter, and are each agreeing to be bound by their summary judgment motion. Is that a correct under-

standing?" DEF. COUNSEL: "Yes, your Honor." PL. COUNSEL: "That's correct, your Honor." COURT: "OK. And I take it you each, obviously, are of the view that the matter can be—can and should be resolved— on the papers that you each have submitted. Fair enough?" PL. COUNSEL: "Fair enough." DEF. COUNSEL: "Yes, your Honor.").)

The Policy defines "Mental Illness" as "any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations or psychological, behavioral or emotional disorder, but excluding demonstrable structural brain damage." (Record at 6; Pl. 56.1 ¶ 9.) Unlike other long-term disability claimants who may receive benefits until they reach age 65, persons who are Disabled because of Mental Illness (under the Policy) may receive benefits for "a total of 24 months." (Record at 5, 12; AI Life 56.1 ¶ 5; Pl. 56.1 ¶ 8.)[2]

Plaintiff's Benefits Claim, dated February 13, 2008, identified his disability as **"traumatic brain injury/neurological damage due to [Hepatitis A and B] vaccinations"** administered to Plaintiff on April 25, 2001 in preparation for an academic research trip to Europe and Africa. (Record at 993, 1375 (emphasis added); see AI Life 56.1 ¶¶ 8, 10, 11; Pl. 56.1 ¶¶ 11, 16.) The Benefits Claim specified May 2007 as Plaintiff's "[d]ate last worked." (Record at 1375.) Plaintiff included a submission from Marianne Mustafa, M.D., Plaintiff's primary care physician, which diagnosed "cognitive deficiency 2° neurologic injury 2° vaccine poisoning" and, secondarily, "fatigue." (Record at 1371; see AI Life ¶ 13.) Dr. Mustafa also diagnosed Plaintiff as suffering "significant loss of psychological, physiological, personal and social adjustments." (Record at 1372.)

In the months that followed Plaintiff's February 13, 2008 filing, several physicians who had treated Plaintiff in 2007 and/or 2008—including Manuel Astruc, M.D., Plaintiff's psychiatrist; Lionel D. Alboum, M.D., a specialist in "Holistic Medicine" and "Internal Medicine"; and Dr. Mustafa—submitted Plaintiff's medical records and their written opinions as to Plaintiff's disability and medical issues to AI Life. (See Record at 993–94, 1375, 1407, 1716.) For example, Dr. Astruc stated, in a letter submitted to AI Life, dated April 9, 2008, that Plaintiff, whom Dr. Astruc had treated since March 2004, is unable to work in his occupation or to perform work of any kind "due to poisoning by Heavy Metal." (Record at 1407; see AI Life 56.1 ¶ 27; Pl. 56.1 ¶ 25.) By letter dated April 22, 2008, Dr. Alboum stated that Plaintiff's weak "emotional and cognitive functioning" is "definitely related" to his April 25, 2001 Hepatitis A and B inoculations, and renders him "*unable* to return to work in his present occupation, nor perform work in any regard." (Record at 993–94 (emphasis in original); see Pl. 56.1 ¶ 23.) Dr. Alboum reported that several hours after receiving the inoculations in 2001, Plaintiff experienced a "myriad of symptoms," including nausea, fever, and cognitive dysfunction. (Record at 993.) Dr. Alboum explained that Plaintiff has "[o]ver the past several years ... undertaken extensive Chelation Therapy" to try to remove from his system the mercury from those inoculations. (Record at 993; see AI Life 56.1 ¶ 29.) Dr. Alboum also described the "intermittent nature" of mercury poisoning symptoms which "leads to [Plaintiff] having periods of weeks to years of being highly functional, interspersed with periods of being non-productive," with "the productive periods becom[ing] shorter, fewer and farther between." (Record at 994 (emphases omitted); see AI Life 56.1 ¶ 30; Pl. 56.1 ¶ 23.)

By letter dated April 22, 2008, Dr. Mustafa confirmed the conclusions of Drs. Astruc and Alboum. (See Record at 1617.) She described Plaintiff as requir-

---

**2.** AI Life reserves "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (Record at 20; AI Life 56.1 ¶ 6; Pl. 56.1 ¶ 10.)

ing medical leave from his employment at Rensselaer since 2007 because, among other reasons, "[h]e has difficulty retaining information, and learning new information"; "ha[s] impairments in short term and long term memory, attention, and concentration"; and "is unable to operate a vehicle as he has no conception of speed." (Record at 1716.) Dr. Mustafa reported that Plaintiff has "had extensive neuropsychiatric testing demonstrating these deficits" and has "required visits with a psychiatrist on a regular basis[ ] to try to address the cognitive functioning problems ... associated with the vaccine/thimerosal poisoning." (Record at 1716; see AI Life 56.1 ¶ 21.) Dr. Mustafa also confirmed that Plaintiff's "overall medical condition deteriorated in 2007" as "a result of mercury poisoning" from the 2001 Hepatitis A and B vaccines. (Record at 1716; see Pl. 56.1 ¶ 24.)

In support of his Benefits Claim, Plaintiff also submitted a "Neuropsychological Evaluation" completed in 2006 by Maria Deinzer Lifrak, Ph.D., a board certified clinical neuropsychologist ("Lifrak Evaluation"). (See Record at 948–63.) The Lifrak Evaluation states that approximately four hours after the April 2001 Hepatitis A and Hepatitis B vaccines were administered, Plaintiff "began to have symptoms including elevated temperature, redness on the face and chest, hives on the arm, tingling sensation in the arms and chest, fatigue, aching knees and chest, nausea, loss of appetite, and infection on the face," and that "[s]ince that time [Plaintiff] has continued to experience a variety of very unpleasant symptoms," including "fatigue, disturbances of cognition, and erratic mood states." (Record at 948.) Laboratory tests completed on March 21, 2002 and "a mineral analysis of hair samples" on March 18, 2005 showed, respectively, "ex-

tremely" and "very high range[s] of mercury," which, according to the Lifrak Evaluation, "are attributed to the Thimerosal mercury compound, contained in the hepatitis B vaccine." (Record at 948–49.) A "urine analysis" on March 28, 2002 similarly "showed mercury levels that were twice the maximum expected level." (Record at 949.) The Lifrak Evaluation concluded that "it appears that [Plaintiff] has suffered toxic mercury poisoning" as a "reaction to hepatitis A and B inoculations on 4/25/01." (Record at 963.)

By letter dated June 6, 2008, AI Life expressed to Plaintiff "regret that we have been unable to make a claim determination within the expected time frame," and asked Plaintiff to "give us additional time to complete our evaluation of your claim." (Record at 157; see Pl. 56.1 ¶ 30.) AI Life also stated that "[w]e expect to complete our evaluation ... and provide you with a benefit determination ... before" July 7, 2008 (Record at 157), but failed to identify the reason for the delay or the basis for the extension request (see Pl. 56.1 ¶ 30.) In fact, AI Life did not provide its benefits determination until October 24, 2008. (See Record at 1250–53.)

Hartman, a clinical psychologist and neuropsychologist retained by AI Life to review the Benefits Claim, issued his report, dated June 27, 2008 ("Hartman Report"). (See Record at 1188, 1487–92.) In preparing his report, Hartman never examined Plaintiff or interviewed Plaintiff's treating physicians. (See Pl. 56.1 ¶ 34; AI Life's Response to Pl. 56.1, dated Oct. 8, 2010 ("AI Life 56.1 Response"), ¶ 34.) And, after opining as to "the presence of exaggeration/malingering in [Plaintiff]," Hartman concluded that Plaintiff's "[s]ymptoms are more consistent with malingering and possibly unrelated psychopa-

thology than heavy metal poisoning."[3] (Record at 1491, 1492, 1188.) Citing Plaintiff's diagnosis of "major depression" in 2000 after his brother's death from brain cancer, Hartman concluded that "[t]here is no reasonable likelihood that [Plaintiff's] symptoms are the result of mercury poisoning ... and no reasonable likelihood that his symptoms are chronic effects of his vaccination." (Record at 1488, 1492; AI Life 56.1 ¶ 36.)

The Hartman Report appears to have been "reviewed for clarity and comprehensiveness" by an independent claims consultant, Lori Cohen, Ph.D., before being issued, and, even after the June 27, 2008 date appearing on the Report, the Hartman Report was further modified at the request of managers at AI Life. (Record at 1017–19.)

On July 10, 2008, three days after AI Life's stated deadline for a determination of July 7, 2008 (see Record at 157), Plaintiff wrote to AI Life inquiring about the status of his Benefits Claim (see Record at 1672; Pl. 56.1 ¶ 31.) On July 15, 2008, AI Life provided Drs. Alboum, Lifrak, and Mustafa with copies of the Hartman Report, and requested their reactions to the Hartman Report within 10 days. (See Record at 154–56; Pl. 56.1 ¶ 36.) By letter to Plaintiff dated July 17, 2008, AI Life (again without explanation) requested "additional time" to evaluate the Benefits Claim, stating that it expected to provide Plaintiff with a determination by August 15, 2008.[4] (Record at 152; Pl. 56.1 ¶ 38.)

On July 25, 2008, Dr. Alboum submitted additional medical records in support of

the Benefits Claim, including the results of two different urinalyses conducted in 2002. (See Record at 984–88.) Dr. Alboum sought to rebut, point-by-point, the Hartman Report conclusions. (See Record at 977–81.) Dr. Alboum stated, among other things, that Hartman "is not a physician, is not up to date with respect to the literature or recent developments concerning Thimerosal exposure in adults, and ... ignores the important issue of the amount of Thimerosal received [by Plaintiff in April 2001] from the multi-dose vial which was in excess of amounts administered in [the] controlled medical studies" cited in the Hartman Report. (Record at 979.) Dr. Alboum also contended that the Hartman Report failed to explain "the significant results evidenced in the hair tests ..., corroborated by both urine testing an[d] even a test of other factors that provide [a]n indication of the heavy metal poisoning." (Record at 979, 984–88.) Dr. Alboum reaffirmed that "the Hep[atitis] B vaccine has been noted [in the medical literature] ... as damaging brain cells thus resulting in a multitude of dysfunctions within the body, and these account for [Plaintiff's] observed ('psychological') symptoms." (Record at 979.)

By letter dated July 27, 2008, Dr. Lifrak also disagreed with the Hartman Report's conclusions. (See Record at 1512; AI Life 56.1 ¶ 43.)

On August 4, 2008, AI Life informed Plaintiff by letter that Plaintiff had **"me[t] the definition of disability"** under the Policy, but also that AI Life was "still in the process of confirming if [Plaintiff's]

---

**3.** It should be noted that, upon questioning from the Court at oral argument, defense counsel totally disavowed Hartman's opinion that Plaintiff was "malingering." Q: "You don't stand by that [malingering] determination .... Isn't that right?" A: "That's correct, your Honor. And I would just note that

AI Life did not make a decision or determination that [Plaintiff] was malingering." (Hr'g Tr. at 3:21–4:1.)

**4.** As noted, AI Life also missed this second self imposed deadline by more than two months. (See Record at 1250–53.)

symptoms are the result of Mercury Poisoning ... or if [the] condition falls under the Mental Illness limitation" in the Policy.[5] (Record at 147, 149 (emphasis added).)

On August 22, 2008, Hartman issued a response to Dr. Alboum's July 25, 2008 submission, conceding "[t]he theoretical capability of mercury to neurotoxically poison an adult," but affirming that "[m]y conclusions ... remain the same" because "the amount of mercury ... [in the] hepatitis vaccination can[not] be reasonably connected to the panoply of symptoms alleged by [Plaintiff]." (Record at 1547–48.) Hartman also stated that Doctors Data, Inc., the company that performed Plaintiff's urine analyses on March 28, 2002 (*see* Record at 984), has been listed on the website, www.quackwatch.com, as performing "nonstandard laboratory tests" that "artificially raise[mercury levels] by using a Mercury scavenger (chelating agent)." (Record at 1544; *see* AI Life ¶¶ 53–54.) And, despite AI Life's concession on August 4, 2008 that Plaintiff was "disabled ... due to severe symptoms" (Record at 149), Hartman stood by his previous claim of "malingering," finding a "strong[ ] suggest[ion]" that Plaintiff has "intentional[ly] attempt[ed] to exaggerate [his] symptoms" (Record at 1546–48.) At oral argument, counsel for AI Life acknowledged that Hartman's insistence on "malingering" is inconsistent with AI Life's finding of a disability. (*See* Hr'g Tr. at 25:16–19 (Q: "[T]he defense disavows [Hartman's conclusion] by acknowledging

that it's not malingering and that there is a disability. Right?" A: "Yes. We made the disability [determination].").)

On August 27, 2008, an AI Life claims examiner conceded in an e-mail message to coworkers, "I'm just not sure of [the] content [of Hartman's August 22, 2008 response]. It's a little harsh, but I'm not sure if it would need to be changed." (Record at 1070.) At oral argument, the Court questioned counsel for AI Life as to this and similar AI Life e-mails:

Q: [T]here are some internal e-mails which suggest that Dr. Hartman's report was ... 'reviewed' ... [,] 'adjusted,' ... 'amended' ... or 'changed,' before it was issued. I don't know what to make of that. Have you ever thought about that? Those e-mails are from June, July, and August of 2008.

A: Yes, your Honor. It's a good question.... Dr. Hartman's [August 22, 2008] report was a little bit harsh in addressing th[e] criticisms from Dr. Alboum, and, you know, to maintain the decorum of professionalism, [AI Life] personnel asked Dr. Hartman to maybe calm down with the language a bit. That's the extent of those revisions or amendments that occurred.

Q: Calm down to say what instead of what?

A: Well, that we don't know, your Honor.... It was just harsh language.... And that's just not the

---

**5.** Defendant's counsel at oral argument argued—for the first time—that "[i]t doesn't matter what caused the mental illness under the [Policy]. Even if the mental illness was caused by mercury toxicity as a result of inoculations, it's still mental illness," and, therefore, subject to the Policy's 24 month limitation on benefits. (Hr'g Tr. at 10:17–20.) Astonishingly, counsel referred to the

Policy as "a cheaper plan"—although he could not recall the amount of premiums—and asserted that Rensselaer "could have purchased a more expensive plan." (Hr'g Tr. at 13:17–20; *see* Hr'g Tr. at 17:21–23 (Q: "What's a monthly premium for this cheap plan?" A: "Your Honor, I don't know what that is.").)

image that [AI Life] wanted to portray.

(Hr'g Tr. at 5:3–6:19.)

On September 23, October 1, and October 10, 2008, Plaintiff's treating physicians (again) voiced their disagreement with the Hartman Report. (*See* Record at 947, 968–75, 1575–77.) Dr. Alboum contended that the tests Hartman questioned are "standard for such medical instances of heavy metal poisoning," and that Hartman failed to account for all "three independent tests[, *i.e.*, one hair test and two urinalyses]—using three different methodologies—done on this patient all provid[ing] clear evidence of mercury poisoning post vaccinations." (Record at 969 (emphases omitted), 976–88; *see* Pl.'s Response to AI Life 56.1, dated Sept. 23, 2010 ("Pl. 56.1 Response"), ¶ 31.) Dr. Alboum restated his conclusion that Plaintiff's "symptoms are due to damage (from the vaccines/Thimerosal) to physiological functioning within the brain and body." (Record at 971.) Dr. Astruc also confirmed "to a high degree of medical certainty" "that the nature of [Plaintiff's] disability is the result of an **injury or trauma to his brain** due to the Hepatitis A and Hepatitis B Vaccination" in April 2001. (Record at 1577 (emphasis added).)[6] Dr. Lifrak responded that, before April 2001, Plaintiff "was by all accounts at the apex of his career" and suffered "almost immediate ... adverse reactions" to the 2001 vaccines, with "[a] host of unpleasant symptoms continu[ing] to this day." (Record at 947.)

On October 10, 2008, Dr. Leikin, a medical toxicologist, submitted, at AI Life's request, a one page "Peer Review" of the Hartman Report and of Plaintiff's medical records. (AI Life 56.1 ¶ 61; *see* Record at 1571; Pl. 56.1 ¶ 50.) Dr. Leikin concluded that he "do[es] not believe that thimerisol [sic] toxicity is a plausible explanation for [Plaintiff's] symptoms." (Record at 1571.) He said, "[t]here is no study that I know of that affirmatively associates thimerisol [sic] exposure to development of cognitive issues in adults." (Record at 1571.)

By letter dated October 24, 2008, AI Life (finally) determined Plaintiff's Benefits Claim ("Claim Determination"), acknowledging at the outset that "we did determine that you were disabled due to your severe cognitive impairment." (Record at 1250.) At the same time, AI Life stated, "we have determined that your symptoms [are not] the result of organic mercury toxicity or any other physical reason. Therefore, we find that your disabling symptoms of cognitive impairment would fall under the [24 month] limitation[ ] of the Mental Illness aspect of" the Policy. (Record at 1250.)

AI Life advised Plaintiff that any appeal of the Claim Determination must be "in writing within 180 days," in which case AI Life "will review the matter again, and notify you of our decision no later than 45 days following the receipt of your written request." (Record at 1253.)

On April 21, 2009, Plaintiff appealed AI Life's Claim Determination. (*See* Record at 924–27.) In support of his appeal, Plaintiff presented a report, dated April 6, 2009, from Mark R. Geier, M.D., Ph.D., a research scientist at the National Institutes of Health, who confirmed that "the Hepatitis A and Hepatitis B vaccines that [Plaintiff] received on [April 25, 2001] caused or significantly contributed to, or

---

**6.** At oral argument, Plaintiff's counsel (persuasively) pointed out that Plaintiff had presented evidence of "demonstrable structural brain damage," which renders the Mental Illness limitation inapplicable. (Record at 6; *see* Hr'g Tr. at 22:19–23:18); *see also* page 3 above.

significantly exasperated his medical conditions," and "there is no indication of a previous medical condition." (Record at 936; *see* Pl. 56.1 ¶ 75.) Dr. Geier also pointed to at least 18 scientific or medical journal reports that "all help to establish an association between hepatitis B immunization and neurological symptoms." (Record at 936–45.)

By letter dated June 4, 2009, AI Life informed Plaintiff that AI Life's earlier notification of Plaintiff's right to appeal "was premature as [Plaintiff's] claim remains open and approved for payment" until October 23, 2010. (Record at 184, 242; *see* AI Life 56.1 ¶ 78; Pl. 56.1 ¶ 82.) By letter dated June 10, 2009, Plaintiff's counsel responded that Plaintiff "has already submitted sufficient documentation from numerous physicians to fully support a physically-disabling condition," "no further documentation is necessary," and "there is no reason whatsoever to postpone the appeal any longer." (Record at 232–33; *see* AI Life 56.1 ¶ 80; Pl. 56.1 ¶ 83.) By letter dated July 2, 2009, AI Life responded that because "you ... will not be forwarding any additional documentation to support your position that [Plaintiff] suffers from a physically disabling condition, we will honor your request to appeal the decision to impose the limitation." (Record at 222; *see* AI Life 56.1 ¶ 82; Pl. 56.1 ¶ 84.)

On August 4, 2009, AI Life modified its position yet again, informing Plaintiff that in order to complete the appeal, "we believe it is appropriate to arrange for an Independent Medical Examination ('IME') to be conducted by a physician Board Certified in Neuropsychology." (Record at 206; *see* AI Life 56.1 ¶ 83.) On August 14, 2009, Plaintiff's counsel responded that "[t]he IME you are requesting can in no

way shed any light on the effects of the vaccines/Thimerosal (organic mercury) toxicity, which occurred over eight years ago." (Record at 195–96.) On August 18, 2009, AI Life stated that, upon review of Plaintiff's August 14, 2009 letter, AI Life "would like to look at other alternatives," including a review of Plaintiff's medical records at the time of his April 25, 2001 inoculation.[7] (Record at 193.) The next day, August 19, 2009, Plaintiff's counsel "ask[ed] for an immediate decision on our client's appeal," stating that the "the documents, which you now seek, were never previously requested and therefore, are not part of the administrative record of this appeal." (Record at 191.)

On August 26, 2009, AI Life denied Plaintiff's appeal on the ground that it "did not find sufficient evidence to substantiate that [Plaintiff's] disability is based on a physical condition." (Record at 187.) AI Life concluded that "[w]ithout any medical documentation prior to April 2001 and the period immediately thereafter, we are unable to determine a baseline of [Plaintiff's] health condition" at the time of administration of the Hepatitis A and B vaccines, and, thus, the "Mental Illness Benefits provision was appropriately applied to his claim following the medical review." (Record at 188.) Although AI Life had committed to an appeal decision "no later than 45 days following the receipt of [Plaintiff's] written request" (Record at 1253), AI Life, in fact, issued its determination 127 days later (*see* Record at 924).

### III. Legal Standard

■ "In an action under [ERISA's civil enforcement provision], the district court conducts arbitrary-and-capricious review of ERISA-fund administrators' discretion-

---

**7.** AI Life conceded at oral argument that this was the first time AI Life had sought to examine Plaintiff's 2001 medical records. (*See* Hr'g Tr. at 14:12–17.)

ary decisions." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 133, 137 n. 2 (2d Cir.2010); *see Pepe v. Newspaper & Mail Deliverers'-Publishers' Pension Fund,* 559 F.3d 140, 146 (2d Cir.2009). "Under th[is] deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be ... without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 132 (2d Cir. 2008) (internal quotation marks omitted).

The Court's standard of review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits." *McDonald v. W.-S. Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003) (citing *Hackett v. Xerox Corp. Long–Term Disability Income Plan,* 315 F.3d 771, 774–75 (7th Cir.2003)): *see Demirovic v. Bldg. Serv. 32 B–J Pension Fund,* 467 F.3d 208, 212–16 (2d Cir.2006); *Magee v. Metro. Life Ins. Co.,* 632 F.Supp.2d 308, 317 (S.D.N.Y.2009) ("[S]uch a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." (internal quotation marks omitted)).

▓ "Where the decision to grant or deny ERISA benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Mohamed v. Sanofi–Aventis Pharm.,* No. 06 Civ. 1504, 2009 WL 4975260, at *9 (S.D.N.Y. Dec. 22, 2009) (quoting *Anderson v. Sotheby's, Inc.,* No. 04 Civ. 8180, 2006 WL 1722576, at *15 (S.D.N.Y. June 22, 2006)); *see Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999). "The district court sits in effect as an appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious." *Mohamed,* 2009 WL 4975260, at *9 (internal quotation marks and alterations omitted). "[A] district court may decide a case by summary bench trial [*i.e.,* without live testimony and exclusively on the record before it,] upon stipulation of the parties as long as the parties have willingly foregone their right to a full trial." *Acuff–Rose Music, Inc. v. Jostens, Inc.,* 155 F.3d 140, 142–43 (2d Cir.1998); *see Brach's Confections, Inc. v. McDougall,* 320 F.Supp.2d 726, 727 (N.D.Ill.2004).

## IV. Analysis

▓ Because AI Life concedes that Plaintiff is "disabled from [his] occupation due to severe symptoms," the narrow issue for determination is whether AI Life's conclusion that Plaintiff's disability falls under the Policy's Mental Illness limitation and is not "the result of organic mercury toxicity or any other physical reason" is arbitrary and capricious.[8] (Record at 149, 1250.) The Court concludes, for the reasons stated below, that, upon the record presented to the Court for review, AI Life's denial of Plaintiff's Benefits Claim was "unsupported by substantial evidence, and therefore

---

**8.** AI Life stated: "[W]e have determined that your symptoms would not be the result of organic mercury toxicity or any other physical reason. Therefore, we find that your disabling symptoms of cognitive impairment would fall under the limitations of the Mental Illness aspect of [the Policy]." (Record at 1250.)

arbitrary and capricious." *Durakovic*, 609 F.3d at 142.

### (1) Strong Evidence Was Presented that Mercury Poisoning Caused Plaintiff's (Physical) Disability

Plaintiff presented to AI Life substantial evidence that his disability was organic or physical in nature and was caused by mercury poisoning from vaccines administered to him in April 2001. This evidence includes the following:

- Diagnoses and analysis, dated February 13 and April 22, 2008, by Plaintiff's primary care physician, Dr. Mustafa, as to the deterioration of Plaintiff's "overall medical condition" due to "mercury poisoning" from the 2001 vaccines. (Record at 1371–72, 1716.)

- Diagnoses and analysis, dated April 9 and October 1, 2008, by Plaintiff's psychiatrist, Dr. Astruc, of "injury or trauma to [Plaintiff's] brain due to the Hepatitis A and Hepatitis B Vaccination," causing Plaintiff's disability. (Record at 1407, 1575–77.)

- Diagnoses and analysis, dated April 22, July 25, and September 23, 2008, by Dr. Alboum, an internal medicine specialist who treated Plaintiff, of Plaintiff's "myriad" and "intermittent" "symptoms of Mercury Toxicity" from the vaccines. (Record at 994,977–81,-968–75.)

- Diagnoses and analysis in 2006 and again on October 10, 2008, by Dr. Lifrak, a board certified clinical neuropsychologist who evaluated Plaintiff on several occasions, of Plaintiff's "toxic mercury poisoning" as an "adverse reaction to [the] Hepatitis A and Hepatitis B vaccine." (Record at 963, 947.)

- Diagnosis, dated April 6, 2009, by Dr. Mark R. Geier, M.D., Ph.D., that the 2001 vaccines "caused or significantly contributed to, or significantly exasperated [Plaintiff's] medical condition." (Record at 936–45.)

- Accounts of Plaintiff's severe adverse reaction to the vaccines which occurred four hours after they were administered, "including elevated temperature, redness on the face and chest, hives on the arm, tingling sensation in the arms and chest, fatigue, aching knees and elbows, nausea, loss of appetite, and infection on the face." (Record at 948, 993.)

- Urinalyses of Plaintiff, conducted March 11 and March 28, 2002, showing, respectively, that Plaintiff's "symptomatology . . . could be compatible with heavy metal intoxication" and that Plaintiff's mercury levels "equal[ ] or exceed[ ] twice the maximum expected level." (Record at 983, 984.)

- Dr. Lifrak's evaluation of hair analysis, conducted March 18, 2005, which showed "very high" levels of mercury. (Record at 948–49.)

- Review and analysis by Drs. Geier and Alboum, dated April 1 and April 6, 2009, of at least 18 "studies that affirmatively associate Thimerosal exposure to neurotoxicity, cell death, and various other pathways that would inhibit cognitive functioning." (Record at 935–45.) "The consensus of these studies is that from a few days to several weeks following hepatitis B immunization, vaccine recipients are at increased risk for developing neurological symptoms," which "oftentimes . . . may be severe, and result in the patient experiencing a chronic syndrome that may last for many months or years following immunization." (Record at 936.)

- Plaintiff's submission of "voluminous medical journal articles in support of his claim for disability on the basis of

mercury poisoning." (AI Life Mem. at 12 (citing Record at 260–617, 634–96, 731–912, 1260–1363).)

The plethora of medical records and opinions submitted by Plaintiff's treating physicians, all of whom determined that Plaintiff suffers from vaccine/thimerosal poisoning, "provide[s] substantial medical evidence establishing that [P]laintiff's disability is due to a physical condition." (Pl. Surreply at 4; *see* Pl. Mem. at 13.) Under ERISA, "the decision-maker must consider the evidence presented by both parties prior to reaching and rendering his decision." *Neely v. Pension Trust Fund*, No. 00 Civ.2013, 2004 WL 2851792, at *10 (E.D.N.Y. Dec. 8, 2004) (quoting *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am.*, 715 F.2d 853, 858 n. 5 (3d Cir.1983)).

### (2) AI Life Submitted a Weak Medical Response

AI Life relied almost exclusively upon Hartman and Leikin in rejecting Plaintiff's Benefits Claim. (*See* Record at 1188, 1489–1492, 1571.) Neither of AI Life's experts examined Plaintiff; neither interviewed Plaintiff's treating physicians. (*See* Pl. 56.1 ¶ 34; AI Life 56.1 Response ¶ 34.) And, neither sought to examine Plaintiff's 2001 medical records, which AI Life did not even request until August 18, 2009, *i.e.*, more than 10 months after Hartman and Leikin had completed their review of Plaintiff's Benefits Claim. *See* footnote 7 above.

### Hartman

Hartman, who is not a medical doctor (*see* Hr'g Tr. at 25:22–23), concluded—erroneously in the Court's view—that "[t]here is no information provided in the record that would substantiate significant mercury exposure in [Plaintiff]" (Record at

1490.) He also concluded, also incorrectly in the Court's view, that "[t]here is no body of scientific literature to suggest that thimerosal and/or hepatitis vaccinations could or might have caused or contributed to [Plaintiff's] claimed symptoms." (Record at 1188.) Hartman also found that Plaintiff's "[s]ymptoms are more consistent with malingering and possibly unrelated psychopathology than heavy metal poisoning" (Record at 1492), a conclusion that was thoroughly discredited and abandoned by AI Life at oral argument (*see* Hr'g Tr. at 25:16–19 (Q: "[T]he defense disavows [Hartman's conclusion] by acknowledging that it's not malingering and that there is a disability. Right?" A: "Yes. We made the disability [determination].").) And, even after AI Life conceded that Plaintiff was "disabled" on August 4, 2008 (Record at 149), Hartman curiously devoted much of his August 22, 2008 report to Plaintiff's alleged "exaggeration in the context of potential secondary gains of work avoidance and compensation" (Record at 1546–48.)

### Leikin

In a terse, one page "report," Dr. Jerold B. Leikin, a medical doctor, found no "clinical evidence for mercury toxicity" in Plaintiff, and stated that even if toxicity did exist, "no study that I know of . . . affirmatively associates thimerisol [sic] exposure to development of cognitive issues in adults."[9] (Record at 1571; *see* Hr'g Tr. at 27:3–7.) Leikin's one page report is hardly convincing. *See Kalish v. Liberty Mut.*, 419 F.3d 501, 509 (6th Cir.2005) (rejecting expert report that "dedicates only one page to analyzing [plaintiff's medical] records").

Neither Hartman nor Leikin accounts for the diagnosis of Dr. Astruc who "s[aw] no evidence of a psychiatric illness" or of "malingering." (Record at 1577.) Nor do

---

9. Dr. Leikin repeatedly misspelled "thimerosal" in his report. (Record at 1571.)

they suggest a response to the question raised by Dr. Lifrak, namely why "a man at the height of his career [would] want to avoid work, hassle continuously with the insurance company for compensation, be restricted to his home, need his elderly parents to assist him with everyday functions, and risk losing all that he has worked to obtain." (Record at 947; *see* Pl. 56.1 ¶ 33 n. 3; AI Life 56.1 Response ¶ 33.)

As noted, counsel for AI Life conceded at oral argument that AI Life disavowed the conclusion of Hartman that Plaintiff may be "malingering." (Hr'g Tr. at 3:21–4:1 (Q: "You don't stand by that determination .... Isn't that right?" A: "That's correct, your Honor. And I would just note that AI Life did not make a decision or determination that [Plaintiff] was malingering."); Record at 1492); *see also* footnote 3 above; *Magee*, 632 F.Supp.2d at 320 (denial of benefits arbitrary and capricious where "[defendant's] decision ... is contradicted by [its] own [expert's] conclusion"). Counsel also sought to distance AI Life from Hartman's use of "harsh language" in his August 22, 2008 report, which resulted in "revisions or amendments" to Hartman's work. (Hr'g Tr. at 5:3–6:19 (Q: "[T]here are some internal e-mails which suggest that Dr. Hartman's report was ... 'reviewed' ... [,] 'adjusted,' ... 'amended' ... or 'changed,' before it was issued.... Have you ever thought about that?" ... A: "Yes, your Honor. It's a good question.... Dr. Hartman's [August 22, 2008] report was a little bit harsh in addressing th[e] criticisms from Dr. Alboum, and, you know, to maintain the decorum of professionalism, [AI Life] personnel asked Dr. Hartman to maybe calm down with the language a bit. That's the extent of those revisions or amendments that occurred." Q: "Calm down to say what instead of what?" A: "Well, that we don't know, your Honor.... It was just

harsh language.... And that's just not the image that [AI Life] wanted to portray.").)

Nor do Hartman and Leikin account for the fact that the Social Security Administration, in February 2009, approved Plaintiff's claim for long term disability benefits, finding that Plaintiff "became disabled under our rules on July 31, 2007." (Record at 1166; *see* Pl. 56.1 ¶ 67); *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir.2006) ("*Glenn I*"), *aff'd*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ("That [defendant] apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review."); *Magee*, 632 F.Supp.2d at 320.

AI Life refers to Plaintiff's refusal of its August 4, 2009 request for an IME, a request made some 8 years after Plaintiff's alleged injury and 18 months after his Benefits Claim was filed. (*See* AI Life Mem. at 14, 21; AI Life Reply at 1,6.) Plaintiff refused the request because it was made (more than 9 months) after AI Life's denial of his claim on October 24, 2008. (*See* AI Life Mem. at 14, 21; AI Life Reply at 1, 6.) The only case AI Life cites for the contention that Plaintiff's refusal was "unjustified and unreasonable" (AI Life Reply at 6) holds that such refusal does not justify defendant's finding of non-disability because "it presents no evidence regarding whether [p]laintiff was or was not actually disabled," *Kochenderfer v. Reliance Standard Life Ins. Co.*, No. 06 Civ. 620, 2009 WL 4722831, at *13 (S.D.Cal. Dec. 4, 2009).

### (3) AI Life's Unduly Narrow View of Plaintiff's Evidence

As Dr. Alboum stated, "[i]t seems ... that no amount of evidence could ever convince" AI Life that Plaintiff's disability

was caused by mercury poisoning from the 2001 vaccines. (Record at 970.) There is support for this idea in the record.

First, despite Plaintiff's substantial submissions, including laboratory testing and multiple, uniform diagnoses from treating physicians confirming mercury poisoning from the vaccines, Hartman could find "no information provided in the record that would substantiate significant mercury exposure in [Plaintiff]." (Record at 1490.) Similarly, Leikin "d[id] not find any clinical evidence for organic mercury toxicity either by history, physical exam or laboratory analysis." (Record at 1571.) Hartman and Leikin appear to have overlooked the results of at least two laboratory analyses of Plaintiff's urine and hair in 2002 and 2005 which indicate " 'heavy metal intoxication' " and "very high" levels of mercury, and Plaintiff's immediate negative reaction to the 2001 vaccines hours after receiving them. *See* pages 16–17 above. They also overlooked the diagnoses of no less than five of Plaintiff's doctors (four of whom examined Plaintiff) of "injury or trauma to [Plaintiff's] brain due to the Hepatitis A and Hepatitis B Vaccination" of April 2001. *See* pages 16–17 above; (Record at 1490 n. 3) ("Evaluation of mercury exposure in an individual patient ideally includes the presenting history, physical examination, consideration of the differential diagnosis, and mercury analysis of blood ... [,] urine," and "hair specimens."). AI Life's experts "close[d] their] eyes to the evidence." (Record at 975.)

■ AI Life's "wholesale embrace" of Hartman and Leikin's incomplete reports in the face of numerous contrary reports submitted by Plaintiff's treating physicians is indicative of AI Life's abuse of discretion. *See McCauley,* 551 F.3d at 136–37

(where defendant "seized upon" one report and "ignored" another); *Durakovic,* 609 F.3d at 140–41 ("[Defendant's] consideration of [Plaintiff's] claim ... was one-sided."). Although courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physicians, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *see Troy v. Unum Life Ins. Co. of Am.,* No. 03 Civ. 9975, 2006 WL 846355, at *10 (S.D.N.Y. Mar. 31, 2006).

Second, as noted, Hartman incorrectly concluded that "[t]here is no body of scientific literature to suggest that thimerosal and/or hepatitis vaccinations could or might have caused or contributed to [Plaintiff's] claimed symptoms." (Record at 1188.) And, Dr. Leikin asserted that "[t]here is no study that I know of that affirmatively associates thimerisol [sic] exposure to development of organic mercury toxicity." (Record at 1571.) In his 12 page report in support of Plaintiff's Benefits Claim, Dr. Geier discussed 18 scientific and medical articles whose "consensus ... is that from a few days to several weeks following hepatitis B immunization, vaccine recipients are at increased risk for developing neurological symptoms. It has sometimes been observed [that] these neurological symptoms following immunization may be severe, and result in the patient experiencing a chronic syndrome that may last for many months or years following immunization."[10] (Record at 936.) One such article concluded that, "in light of ... a large number of case reports, epidemiol-

10. In the Record submitted by AI Life, pages 3 and 8 are missing from Dr. Geier's report.

(*See* Record at 936–45.)

ogy statistics, and biological mechanisms[,] ... there is a direct link between serious acute and chronic adverse reactions following recombinant hepatitis B vaccination." (Record at 942.) Another "concluded that hepatitis B vaccination can occasionally lead to a variety of serious adverse reactions which can affect many different organ systems." (Record at 942.)

Neither Hartman nor Leikin mentioned any of the articles discussed by Dr. Geier (*see* Record at 936–45) or submitted by Plaintiff (*see* Record at 260–617, 634–96, 731–912, 1260–1363), even though those articles led Dr. Geier to conclude that "one or both of the [2001] vaccines caused the medical conditions that occurred post-vaccinations" (Record at 936.) The Court is troubled by AI Life's wholesale rejection of the medical literature offered in support of Plaintiff's Benefits Claim, notwithstanding Hartman's statement that "1 consider myself reasonably current and well informed about th[e] literature" in this area. (Record at 1546.) In Dr. Alboum's words, AI Life's experts' "lack of awareness (or intentional disregard or oversight) of the[se] documented symptoms associated with mercury poisoning ... is inexcusable." (Record at 979); *see Neely,* 2004 WL 2851792, at *10 ("[T]he law in the Second Circuit requires that, the plan's fiduciary must consider any and all pertinent information reasonably available to him." (emphasis and internal quotation marks omitted)); *Glenn I,* 461 F.3d at 669 (where defendant "did not indicate that it had considered [important evidence from plaintiff's expert], not did it provide a reason for rejecting it"); *Kalish,* 419 F.3d at 510–11.

#### (4) AI Life's Unpersuasive 11th Hour Argument(s)

For the first time at oral argument, AI Life advanced two seemingly new (and surprisingly restrictive) interpretations of the Policy language, which support the view that AI Life's Claim Determination was arbitrary and capricious. First, defense counsel suggested that Plaintiff's Benefits Claim was rejected because Plaintiff participated in AI Life's "cheaper plan," and that, Plaintiff's employer, Rensselaer "could have purchased a more expensive plan." (Hr'g Tr. at 13:17–20 ("[Rensselaer] could have purchased a more expensive plan that didn't have a 24–month limitation. They could have done that. But they chose to go with a cheaper plan with a limitation. So the plan is the plan. They purchased this language. The language is plain."); *see* Hr'g Tr. at 17:21–23 (COURT: "What's a monthly premium for this cheap plan?" DEF. COUNSEL: "Your Honor, I don't know what that is."); Hr'g Tr. at 18:17–23 (COURT: "I'm just trying to figure out, what does [cheap] mean in this case. I think you used it in the context that the coverage is cheap. But I'm curious to know if the premium is also cheap. If it's 5 bucks a month, then I'd say, you know, you get what you pay for. But ... I'm trying to figure out what you mean by 'cheap.' ").)

Second, AI Life argued that "[i]t doesn't matter what caused the mental illness under the [Policy]. Even if the mental illness was caused by mercury toxicity as a result of inoculations, it's still mental illness [presumably in contrast to physical illness]," and subject to the Policy's 24 month limitation on benefits. (Hr'g Tr. at 10:17–20.) But, according to AI Life's earlier stated rationale for denying Plaintiff's Benefits Claim, the cause of Plaintiff's disability does matter: "[W]e have determined that your symptoms would not be the result of organic mercury toxicity or any other physical reason. Therefore, we find that your [disability] would fall under the limitations of the Mental Illness aspect of [the Policy]." (Record at 1250.) AI

Life's position at oral argument seems to be at odds with the procedures employed by AI Life during the claims process (*i.e.,* the lengthy review—between the August 4, 2008 finding of a disability and the August 26, 2009 denial of Plaintiff's appeal—in order to determine whether mercury poisoning caused Plaintiff's disability (*see* Record at 147–50, 186–89)).[11] The point is that, if "[i]t doesn't matter what caused the mental illness," then why was it necessary for AI Life's experts, Hartman and Leikin, to render conclusions as to whether Plaintiff's "symptoms could be the result of mercury poisoning"? (Record at 1492, 1571; *see* Hr'g Tr. at 10:17, 26:19–27:12 (COURT: "So what's the point of [Dr. Leikin] concluding that there is no evidence of mercury toxicity?" ... DEF. COUNSEL: "Because he was asked [that] question[ ].").)

If AI Life believed that, under the Policy, "mental illness ... caused by mercury toxicity ... [is] still mental illness" (Hr'g Tr. at 10:18–20), then AI Life's analysis of Plaintiff's Benefits Claim could have ended on August 4, 2008, when it found Plaintiff to be "disabled" due to his severe cognitive impairments. (Record at 149.) Instead, AI Life spent the next year determining whether Plaintiff's "symptoms are the result of [m]ercury [p]oisoning." (Record at 149.) There appears to have been "a predetermined decision to deny benefits." *Caudill v. Sears Transition Pay Plan,* 714

F.Supp.2d 728, 742 (E.D.Mich.2010) ("The utilization of this methodology was improper.").[12]

AI Life recognizes that "the definition of 'mental illness' does have an exception. If the mental illness is caused by demonstrable structural brain damage, then it's not classified as mental illness." (Hr'g Tr. at 14:1–4; *see* Record at 6.) Plaintiff presented substantial evidence that his debilitating symptoms were the result of "structural brain damage." (Record at 6.) Plaintiff claimed benefits for "traumatic brain injury/neurological damage" in his February 2008 Benefits Claim (Record at 993), and Plaintiff presented diagnoses from two of his treating physicians, Drs. Alboum and Astruc, of Plaintiff's "damag[ed] brain cells," "damage (from the vaccines/Thimerosal) to physiological functioning within the brain and body," and "injury or trauma to his brain" (Record at 979, 971, 1577.)

**(5) AI Life's Irregularities, Delays, and Mismanagement**

AI Life's pattern of delay and mismanagement of Plaintiff's claim "further establishes that [its] determination is arbitrary and capricious." (Pl. Mem. at 20–21.) Plaintiff presents a lengthy and convincing list of irregularities in AI Life's determination, including, among other things, the following: (i) "numerous [unexplained] extensions" and missed deadlines for reaching a decision; (ii) apparent "changes" to

---

11. And, AI Life's arguments to the Court in its briefs are that "[Plaintiff] must ... establish that his disability was caused by ... mercury poisoning ... in order to establish eligibility for benefits on the basis of disability caused by a physical condition." (AI Life Mem. at 19.)

12. Moreover, because AI Life has never (before oral argument) provided this rationale to Plaintiff, it does not appear in the record. "[U]nder the arbitrary and capricious standard, ... a district court's review is limited to

the administrative record." *Griffin v. N.Y. State Nurses Ass'n Pension Plan,* 757 F.Supp.2d 199, 211, 2010 WL 5342069, at *9 (E.D.N.Y. Dec. 22, 2010) (internal quotation marks omitted). Courts "will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." *Magee,* 632 F.Supp.2d at 320 (quoting *Juliano v. Health Maint. Org. of N.J., Inc.,* 221 F.3d 279, 287 (2d Cir.2000)).

Hartman's reports; (iii) changing positions on Plaintiff's "appeal rights"; and (iv) AI Life's belated request for an independent medical examination and additional medical records. (Pl. Mem. at 5, 6, 20–21; see Record at 152, 157, 193,206,222, 242, 924, 1017–19, 1070, 1253; Hr'g Tr. at 5:10–6:9.) Also, AI Life erroneously claimed that Plaintiff had failed to inform Rensselaer of his Benefits Claim, perhaps in an "attempt[ ] to negatively influence [P]laintiff's physicians by questioning [P]laintiff's honesty." (Pl. Mem. at 20; see Record at 1086, 1089, 1107, 1116, 1156–60, 1183.)[13] In a letter to Plaintiff's physicians dated April 20, 2009, AI Life "apologize[d] for any miscommunication that was conveyed" in the December 30, 2008 letter—sent by "one of our staff." (Record 1156–60; see Pl. 56.1 ¶ 71.) Plaintiff also points out AI Life's "improper deductions from [Plaintiff's 'Mental Illness'] benefits" to offset New York State disability payments that Plaintiff never received.[14] (Pl. Mem. at 20; see Record at 237–38, 1179.)

AI Life responds (unpersuasively) that there were "no procedural irregularities in AI Life's review" and that AI Life "conducted itself with the utmost professionalism." (AI Life Reply at 9–10; see Hr'g Tr. at 7:2–15 (COURT: "The fact that there was so much slippage in the dates, does that suggest that your client also believed that there might have been a good chance that this is a physical disability?" DEF. COUNSEL: "No. No, your Honor. I think what that reveals is that

AI Life was deliberative in its decision. Rather than make a snap decision based on incomplete information, [AI Life] agreed with [Plaintiff] that he's entitled to benefits [for his disability].").)

"The Plan's procedural irregularities here were serious, had a connection to the substantive decision reached, and call into question the integrity of the benefits-denial decision itself." Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 244 (1st Cir.2006); see Culley v. Liberty Life Assurance Co. of Bos., No. 05 Civ. 2279, 2007 WL 2769649, at *5 (D.N.J. Sept. 21, 2007), aff'd, 339 Fed.Appx. 240 (3d Cir.2009). As noted, "[a]nother example of a procedural anomaly is when an insurance company relies on the opinions of its own non-treating physicians over the opinions of Plaintiff's treating physicians." Harrison v. Prudential Ins. Co. of Am., 543 F.Supp.2d 411, 421–22 (E.D.Pa.2008); see McCauley, 551 F.3d at 136–37; Durakovic, 609 F.3d at 140–41.

### (6) Conflict of Interest

"Taken in combination, these [above described irregularities] are plainly exacerbated by [AI Life's] conflict of interest, as both administrator and payor" under the Policy. McCauley, 551 F.3d at 136. AI Life concedes that such a conflict exists in this case. (See AI Life Mem. at 3 ("AI Life is the claim administrator of the Plan."); AI Life Reply at 7 ("AI Life does pay benefits owed under the Plan.").) "[A]

---

**13.** On December 30, 2008, AI Life informed Plaintiff's physicians by letter that Plaintiff "apparently [made] no mention to [Rensselaer] about his active disability claim" while planning his return to work in January 2009. (Record at 1086, 1089, 1107, 1116; see AI Life 56.1 Response ¶ 70.) On March 5, 2009, Plaintiff's counsel wrote to AI Life that the suggestion that Plaintiff did not advise his employer about his disability claim "is patently false and appears to be an improper attempt on your part to negatively influence our

client's physicians. We demand that you contact the physicians with a correction immediately." (Record at 1183; see Pl. 56.1 ¶ 70.)

**14.** By letter dated June 8, 2009, AI Life acknowledged this error as well, informing Plaintiff that it had "amended the ... worksheet" to reflect that AI Life had underpaid Plaintiff in the amount of $2,381.89. (Record at 237–38; AI Life 56.1 Response ¶ 68.)

district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." *Durakovic*, 609 F.3d at 138 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–15, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (*"Glenn II"*)). AI Life's "'[s]eemingly inconsistent'" and "'financially advantageous'" positions as to Plaintiff's claim "bespeak the influence of a conflict of interest" and support the Court's conclusion that the Claim Determination "was unsupported by substantial evidence, and therefore arbitrary and capricious." *Id.* at 140–42 (quoting *Glenn II*, 554 U.S. at 112–15, 128 S.Ct. 2343); *see McCauley*, 551 F.3d at 131–33. In sum, "[t]his record cannot pass muster even under the deferential arbitrary and capricious standard of review[.]" *Demirovic*, 467 F.3d at 216; *see also Durakovic*, 609 F.3d at 140–42; *McCauley*, 551 F.3d at 131–33; *Glenn I*, 461 F.3d at 669, affd. 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Kalish*, 419 F.3d at 510–11: *McDonald*, 347 F.3d at 172: *Hackett*, 315 F.3d at 774–75: *Troy*, 2006 WL 846355, at *10; *Wein v. Prudential Ins. Co. of Am.*, No. 03 Civ. 6526, 2006 WL 2844176, at *11 (E.D.N.Y. Oct. 2, 2006); *Burdett v. Unum Life Ins. Co.*, No. 06 Civ. 6138, 2008 WL 4469094, at *10 (E.D.La. Sept. 30, 2008) ("[I]t was an abuse of discretion for the plan administrator to deny Plaintiff's disability benefits claim" because, among other things, "medical experts repeatedly examined [p]laintiff, ... each evaluation resulted in objective diagnoses of medical conditions that caused [p]laintiff's [disability]," and the "contrary medical evidence was minimal."); *Chan v. Hartford Life Ins. Co.*, No. 02 Civ. 2943, 2004 WL 2002988, at *8 (S.D.N.Y. Sept. 8, 2004) (where administrator "never had its own physicians actually examine" plaintiff); *Milburn v. Hartford Life & Accident Ins. Co.*, No. 05 Civ. 832, 2007 WL 854824, at *4 (W.D.Ky. Mar. 19, 2007); *Force v. Am-*

*eritech Corp.*, 452 F.Supp.2d 744, 753 (E.D.Mich.2006); *Gawrysh v. CNA Ins. Co.*, 8 F.Supp.2d 791, 794 (N.D.Ill.1998) ("Rather than punishing [Plaintiff] for the inability of medicine to specifically pinpoint the cause of [his disability], [AI Life] should have hired experts or used its own doctors to examine [Plaintiff] to determine the cause ... of [disability]."); *see also Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir.2002) (applying *de novo* review and concluding that "[t]he evidence in the administrative record d[oes] not support the denial of benefits when only [the administrator's] physicians, who had not examined [the plaintiff], disagreed with the treating physicians").

"[N]otwithstanding th[e] deferential posture" of this case, the Court concludes that, on the Record before it, Defendant's denial of benefits was arbitrary and capricious because unsupported by substantial evidence. *Demirovic*, 467 F.3d at 212; *see McCauley*, 551 F.3d at 132; *McDonald*, 347 F.3d at 172–73; *Hackett*, 315 F.3d at 774–75; *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir.2001) ("[D]eferential review is not no review, and deference need not be abject." (internal quotation marks omitted)): *see also Moorman v. Rohm & Haas Long Term Disability Plan*, No. 04 Civ. 3689, 2006 WL 1083603, at *7 (E.D.Pa. Apr. 20, 2006) (defendant's summary judgment motion granted only where there was **"nothing** in the record to indicate any connection between th[e] residual effects [of mercury poisoning] and [plaintiff's] alleged inability to work" (emphasis added)).

■ "Where the decision to deny benefits is unreasonable because it was not based on substantial evidence, as was the case here, reversal, rather than remand, is appropriate." *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06 Civ. 2285, 2007 WL 4373949, at *12 (E.D.N.Y. Dec. 11, 2007)

440

(citing *Zervos v. Verizon N.Y., Inc.,* 277 F.3d 635, 648 (2d Cir.2002) (reversal appropriate where "a denial of benefits based on the record was unreasonable")); *see McCauley,* 551 F.3d at 138. Accordingly, the Court reverses the determination to deny benefits and directs AI Life to provide the requested coverage for Plaintiff's Benefits Claim forthwith. *See Zervos,* 277 F.3d at 648.

## V. Conclusion and Order

For the foregoing reasons, AI Life's Motion for Summary Judgment [# 22] is denied and Plaintiff's Cross–Motion for Summary Judgment [# 25] is granted. The Clerk of the Court is respectfully requested to close this case.